## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SAVVA DELIYANNIDES, FRED RAMOS, FAITH PRITCHARD, on Behalf of Themselves and All Others Similarly Situated,<br><br>          Plaintiffs,<br>v.<br><br>VIMEO.COM, INC.,<br><br>          Defendant. | Case No. 1:26-cv-01915<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Savva Deliyannides, Fred Ramos, and Faith Pritchard ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their undersigned counsel, bring this class action complaint against Defendant Vimeo.com, Inc. ("Vimeo" or "Defendant").

### NATURE OF THE ACTION

1. Vimeo operates a revenue-sharing and subscription-based video streaming service offering an "Over-The-Top" streaming solution (the "Vimeo OTT Platform" or "OTT Platform"). The Vimeo OTT Platform is utilized by more than 287 million businesses, content creators, and marketers to host, manage, and display video content on their respective websites (collectively, "OTT Websites"). Vimeo's notable customers include American Airlines, Nike, Fidelity, Bloomberg, Coca-Cola, and the Martha Stewart brands.[1]

2. OTT Websites that use the Vimeo OTT Platform primarily compensate Vimeo through revenue-sharing agreements. Meanwhile, consumers (the Plaintiffs and putative Class Members) ("Subscribers") pay these OTT Websites subscription or access fees to view their video

---

[1] VIMEO, https://vimeo.com/ (last visited Feb. 10, 2026).

1

content. OTT Website owners often rely on Vimeo to build and manage websites on which their video content is hosted through the use of turn-key products. The OTT Platform does not simply provide the video player and deliver video content to Subscribers; it can generate the entire front-end code and handle back-end infrastructure.

3. Unbeknownst to Plaintiffs and millions of Subscribers who exchanged information or money for exclusive access to pre-recorded video content, when they access video content through or on the OTT Websites, tracking technologies ("Tracking Tools") embedded on the OTT Platform capture their identity, video viewing history, viewing times, and search activity (collectively, "Sensitive Information"). These disclosures to Meta, Google, and other third-party analytic providers and/or advertisers (the "Third Parties" or "Tracking Entities") happen in one of two ways: (1) via interception, duplication, and transmission of communications between Subscribers and the OTT Websites performed instantaneously by the Tracking Tools placed on Subscribers' web browsers; and/or (2) the OTT Platform stores IP addresses, detailed URLs, search queries, and the titles of video content being watched or purchased, and subsequently discloses that information to the Tracking Entities.

4. The Sensitive Information contained within Subscribers' disclosed URLs, metadata, cookies, search queries, and requested video content allows marketing platforms and businesses to piece together holistic profiles of Subscribers' interests, hobbies, and the content they consume. These data points are matched with additional bits of identifying information collected by other websites making use of the same Tracking Tools across the internet.

5. Vimeo does not obtain Subscribers' informed, written consent – provided in a form distinct and separate from other legal agreements or consequences – to share their Sensitive Information. Nor does Vimeo disclose to Subscribers who access video content on the OTT

Websites that it discloses such information to Third Parties. Indeed, Subscribers are often unaware that they are *also* interacting with the Vimeo OTT Platform when selecting and viewing video content on the OTT Websites.

6. Accordingly, Vimeo's disclosure of Subscribers' Sensitive Information to Third Parties violates the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710(b), the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e), and constitutes common law Invasion of Privacy upon Subscribers' and Class Members' reasonable expectations of privacy.

## **PARTIES**

### *Plaintiff Deliyannides*

7. Plaintiff Savva Deliyannides is, and has been at all relevant times, a citizen of Illinois who resides in Chicago, Illinois.

8. Plaintiff Deliyannides has been a paid Subscriber to the Criterion Channel OTT Website since 2020, for which she pays $9.00 per month.

9. Plaintiff Deliyannides used the Criterion Channel OTT Website to access pre-recorded video content, including movies like Neptune Frost, Happy Together, France, and The Rapture.

10. By interacting with the Criterion Channel OTT Website, Plaintiff Deliyannides' Sensitive Information was disclosed to Third Parties, including Meta, through Tracking Tools placed on the webpages she visited on the Criterion Channel OTT Website. These webpages include, but are not limited to, the webpages for the search engine, the specific videos she watched, and the webpage through which Plaintiff Deliyannides subscribed to the Criterion Channel OTT Website.

11. The Sensitive Information disclosed to Third Parties included, but is not limited to, Plaintiff Deliyannides' search terms, the titles or descriptions of videos she watched, and her unique Facebook ID ("FID").

12. Plaintiff Deliyannides had an active Facebook account at the time of her interactions with the Criterion Channel OTT Website.

13. Shortly after visiting the Criterion Channel OTT Website to view video content, Plaintiff Deliyannides began to receive unsolicited advertisements relating to the movies she watched.

14. Plaintiff Deliyannides saw nothing on the Criterion Channel OTT Website that suggested to her that her Sensitive Information would be disclosed to unauthorized Third Parties and did not authorize or consent to the disclosure of her Sensitive Information to any Third Party.

15. Plaintiff Deliyannides would not have used the Website to access video content had she known that her Sensitive Information would be disclosed to unauthorized Third Parties.

16. Plaintiff Deliyannides did not provide written informed consent to the disclosure of her Sensitive Information.

***Plaintiff Fred Ramos***

17. Plaintiff Fred Ramos is, and has been at all relevant times, a citizen of Minnesota who resides in St. Louis Park, Minnesota.

18. Plaintiff Ramos first subscribed to the Criterion Channel OTT Website in February of 2023. Plaintiff Ramos then cancelled his subscription in March of 2024. Plaintiff Ramos resumed paying for his subscription in January of 2025. While subscribed, Plaintiff Ramos paid $107.51 annually for his subscription to the Criterion Channel OTT Website.

19.     Plaintiff Ramos was a paid Subscriber to the CorePower Yoga OTT Website from March 2021 to January 2022, paying $19.99 per month.

20.     Plaintiff Ramos signed up for a free trial to the MHz Choice OTT Website in May of 2023 and paid to subscribe at the end of the trial period. Plaintiff Ramos cancelled his subscription in June of 2023, then reactivated his subscription in September of 2024. Plaintiff Ramos continues to pay a monthly fee to be an active Subscriber of the MHz Choice OTT Website.

21.     Plaintiff Ramos used the OTT Websites he subscribed to for access to and to watch pre-recorded video content.

22.     By interacting with the OTT Websites, Plaintiff Ramos's Sensitive Information was disclosed to Third Parties, including Meta, through the placement of Tracking Tools on the webpages he visited on the OTT Websites. These webpages include, but are not limited to, the webpages for the search engine, the specific videos he watched, and the webpage through which Plaintiff Ramos subscribed to the OTT Websites.

23.     The Sensitive Information disclosed to Third Parties included, but is not limited to, Plaintiff Ramos' search terms, the titles or descriptions of videos he watched, and his unique FID.

24.     Plaintiff Ramos had an active Facebook account at the time of his interactions with the OTT Websites.

25.     Shortly after visiting the OTT Websites to view video content, Plaintiff Ramos began to receive unsolicited advertisements relating to the videos he watched.

26. Plaintiff Ramos saw nothing on the OTT Websites that suggested to him that his Sensitive Information would be disclosed to unauthorized Third Parties and did not authorize or consent to the disclosure of his Sensitive Information to any Third Party.

27. Plaintiff Ramos would not have used the Website to access video content had he known that his Sensitive Information would be disclosed to unauthorized Third Parties.

28. Plaintiff Ramos did not provide written informed consent to the disclosure of his Sensitive Information.

***Plaintiff Pritchard***

29. Plaintiff Faith Pritchard is, and has been at all relevant times, a citizen of Illinois who resides in Chicago, Illinois.

30. Plaintiff Pritchard was a paid Subscriber to the CorePower Yoga OTT Website from 2018 to 2020.

31. Plaintiff Pritchard used the CorePower Yoga OTT Website to access video content, especially video content related to getting certified as a yoga instructor.

32. By interacting with the CorePower Yoga OTT Website, Plaintiff Pritchard's Sensitive Information was disclosed to Third Parties, including Meta, through the placement of Tracking Tools on the webpages she visited on the CorePower Yoga OTT Website. These webpages include, but are not limited to, the webpages for the search engine, the specific videos she watched, and the webpage through which Plaintiff Pritchard subscribed to the CorePower Yoga OTT Website.

33. The Sensitive Information disclosed to Third Parties included, but is not limited to, Plaintiff Pritchard's search terms, the titles or descriptions of videos she watched, and her unique FID.

34. Plaintiff Pritchard had an active Facebook account at the time of her interactions with the CorePower Yoga OTT Website.

35. Shortly after visiting the CorePower Yoga OTT Website to view video content, Plaintiff Pritchard began to receive unsolicited advertisements relating to yoga.

36. Plaintiff Pritchard saw nothing on the CorePower Yoga OTT Website that suggested to her that her Sensitive Information would be disclosed to unauthorized Third Parties and did not authorize or consent to the disclosure of her Sensitive Information to any Third Party.

37. Plaintiff Pritchard would not have used the Website to access video content had she known that her Sensitive Information would be disclosed to unauthorized Third Parties.

38. Plaintiff Pritchard did not provide written informed consent to the disclosure of her Sensitive Information.

*Defendant Vimeo*

39. Vimeo was formed in the state of Delaware and is a video hosting, sharing, and services provider with headquarters at 330 W 34th St, Floor 10, New York, NY 10001. Vimeo works to provide creatives, entrepreneurs, and businesses with a single, easy-to-use platform to make, manage, and share videos.[2] Since its founding, Vimeo shifted its focus entirely to digital, launching its Vimeo OTT Platform in 2017. The OTT Platform is a revenue-share-based service. Vimeo sells its customers a feature-rich, customizable video player for them to upload video content to. Vimeo has grown from a place where creatives show off their work to a platform where both beginners and professionals can create, edit, and share videos. Vimeo has over 1.7 million subscribers in over 190 countries.[3] According to Vimeo, over 350,000 videos are

---

[2] *About,* VIMEO, https://vimeo.com/about (last visited Feb. 10, 2026).
[3] *Id.*

uploaded to the platform every day.[4] Vimeo provides its customers with a comprehensive video delivery solution, including customizable video players, website design templates, and built-in tools for subscriber management and analytics. Through its OTT Platform, Vimeo enables clients to deliver video content on a subscription basis, with Vimeo responsible for the underlying website infrastructure, video delivery, and data tracking mechanisms. Defendant Vimeo can be served by serving its registered agent, The Corporation Trust Company, at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

**JURISDICTION AND VENUE**

40. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class Members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class Member is a citizen of a state different from at least one Defendant.

41. This Court has personal jurisdiction over Defendant because Defendant intentionally directed its conduct into this District by delivering its OTT Platform, including the Tracking Tools at issue, to websites accessed by consumers within this District. Indeed, Vimeo acknowledges as much in troubleshooting articles that specifically reference the features available to Illinois residents. Further, Vimeo's contracts with OTT website operators and its integration with third-party advertising tools foreseeably caused harm to consumers located within this District. In addition, Vimeo tailors its OTT platform for use in Illinois by disabling AI features that process biometric data, a practice that is generally prohibited under Illinois law.

42. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because two of the three Plaintiffs reside in this District, and the harm occurred in this District, as the tracking tools

---

[4] *Id.*

were loaded onto several of the Plaintiffs' devices in this District and caused the interception and transmission of several of the Plaintiffs' Sensitive Information in this District.

**COMMON FACTUAL ALLEGATIONS**

**I.      How Websites Function**

43.      Websites consist of interlinked webpages stored on web servers. When a user navigates to a webpage by entering a URL or clicking a hyperlink, the browser communicates with a Domain Name System (DNS) server, which converts the human-readable web address into a corresponding IP address. The browser then sends an HTTP (HyperText Transfer Protocol) request to the server hosting the webpage, specifying the requested resource. If successful, the server responds with an HTTP response containing the requested content, which is delivered in data packets that the browser reassembles into the complete webpage.

44.      Webpages are structured primarily in HTML (HyperText Markup Language) and can incorporate multimedia elements such as images, audio files, and video content. The browser renders this code into a visual display according to the HTML instructions.

45.      HTTP requests include a Request URL and may contain cookies and a payload. The Request URL comprises a domain name and a path identifying the specific content being requested. URLs frequently include "parameters"—key-value pairs appended after a question mark (?)—that transmit data to the server and influence how the requested content is processed or customized. These parameters can include user IDs, timestamps, video selections, and search queries, allowing the website to track user actions and customize content.

46.      To provide complex website functionalities, developers embed additional programming languages such as JavaScript within HTML documents. JavaScript enables responsive interfaces, user interaction tracking, and delivery of dynamic media such as video.

These advanced functionalities can include monitoring and analyzing user interactions across a website—recording information such as time spent on a page, clicks, scroll behavior, search terms entered, and playback data from embedded media.

47. In short, the website can use this information to track what the user, here Subscriber, is doing or to customize what they see. This data can also be shared with outside companies through built-in tools or code on the site. This data can then be transmitted to third-party analytics or advertising services.

48. A website consists of a collection of interlinked webpages that reside on web servers. While these webpages are stored and delivered from servers, they are ultimately rendered and displayed by the user's internet browser. It is the browser that downloads, interprets, and visually presents the website's code.

49. Webpages are structured documents written primarily in HTML (HyperText Markup Language). These documents can incorporate multimedia elements such as images, audio files, and video content.[5]

50. Each server has an IP address. Multiple webpages can reside on the same server and share an IP address.[6] An IP address is "a unique address that identifies a device on the internet or a local network."[7]

---

[5] *Browsing the web*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn_web_development/Getting_started/Environment_setup/Browsing_the_web (last visited Feb. 10, 2026).
[6] *Id.*
[7] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Feb. 10, 2026).

51. When a user navigates to a webpage, either by entering a URL directly or clicking a hyperlink, the browser communicates with a Domain Name System (DNS) server. The DNS server converts the human-readable web address into a corresponding IP address.[8]

52. After resolving the IP address, the browser sends an HTTP (HyperText Transfer Protocol) request to the server hosting the webpage. This request is directed to the server associated with the IP address and specifies the resource located at the requested URL. If the server processes the request successfully, it responds with an HTTP response. This response includes a status code and the requested content, which is delivered in segmented units known as data packets. The browser then reassembles these packets into the complete webpage.[9]

53. An HTTP request includes a Request URL and may also contain cookies and a payload.[10] The payload often includes metadata and additional parameters that inform how the server should process the request. These details can be sent from the user's browser to the website without the user seeing them. They can include things like user IDs, past searches, or how someone used the website. The website can use this information to track what the user is doing or to customize what they see. This data can also be shared with outside companies through built-in tools or code on the site.

54. The Request URL comprises both a domain name and a path, which together identify the specific content being requested and its hierarchical location within the website, such

---

[8] *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn_web_development/Getting_started/Web_standards/How_the_web_works (last visited Feb. 10, 2026).

[9] *Id.*

[10] The "request payload" (or more simply, "Payload") is data sent by an HTTP Request, normally through a POST or PUT request, where the HTTP Request has a distinct message body. Payloads typically transmit form data, image data, and programming data. *See Request Payload Variation*, SITESPECT, https://doc.sitespect.com/knowledge/request-payload-trigger (last visited Feb. 10, 2026).

as a website name, and the list of nested folders a specific webpage, video, or content may be hosted within.

55.     URLs frequently include "parameters," which are key-value pairs appended after a question mark (?). Parameters serve to transmit data to the server and influence how the requested content is processed or customized.[11] These added details in a website address can include the user's ID, the time they visited, which video they clicked, or what they searched for. When the website receives this information, it can use it to track what the user is doing or show them custom content. This information can also be shared with third-party tools built into the site.

56.     The user's browser then assembles the small packets back into HTML, which is then processed by the user's browser and "rendered" into a visual display according to the instructions of the HTML code.[12] The browser then "renders" the content into a graphical interface viewable and interactive to the user.

57.     To provide more complex website functionalities, website developers include more complex commands written in other computer programming languages, such as JavaScript, within the HTML documents, which enables responsive interfaces, user interaction tracking, and the delivery of dynamic media such as video.[13]

58.     These advanced functionalities can include streaming video content. In such cases, JavaScript may be used to send requests to media servers, retrieve video data, and process that data through an embedded media player within the user's browser.

---

[11] To see examples of how OTT Websites used parameters to provide additional information here, this discussed in Section IV(D)(2).

[12] *Id.*

[13] *See JavaScript: Adding interactivity*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn_web_development/Getting_started/Your_first_website/Adding_interactivity (last visited Feb. 10, 2026).

59.     Additionally, websites often implement JavaScript-based tools to monitor and analyze user interactions across the site. These tools can record information such as time spent on a page, clicks, scroll behavior, search terms entered, and playback data from embedded media. This data can then be transmitted to third-party analytics or advertising services for further processing.

## II.     Vimeo and the OTT Platform

60.     Through the Vimeo OTT Platform, OTT Websites have the ability to upload, host, manage, and stream video content. The OTT Platform delivers video content directly to Subscribers over a high-speed internet connection, bypassing traditional distributors such as cable or IPTV services.

61.     Vimeo likens its OTT Platform to Netflix and is akin to YouTube in that content providers upload video content to Vimeo, and Vimeo then streams the video content to Subscribers. The content hosted through OTT Websites can highlight, aside from a Subscriber's taste or preferences in everyday video content, a Subscriber's closely held beliefs, lifestyles, or attributes, including support for the LGBT community[14] or religious beliefs.[15]

62.     However, unlike Netflix and YouTube, Vimeo conceals its substantial role in the process because the consumer interface is designed to appear as though the video content originates directly from the OTT Website itself, rather than from Vimeo. In effect, Vimeo acts as the actual broadcaster and distributor, but masks that role so the Subscriber does not experience Vimeo as a separate entity or service.

---

[14] *See THE #1 STREAMER FOR ALL THINGS DRAG RACE,* WOWPRESENTSPLUS, signup.wowpresentsplus.com (last visited Feb. 14, 2026) ("The #1 Streamer for all things drag race")
[15] *See Welcome to Formed Forming Catholics for Life,* FORMED, https://formed.org/ (last visited Feb. 14, 2026).

63. Vimeo designed its video player to work across all devices, including desktop and mobile,[16] and the videos themselves can easily be embedded into websites, blogs, or "anywhere else on the web" without the "need to write a single line of code."[17]

64. Vimeo also designs and offers OTT Websites a feature-rich, customizable video player, which is designed to hide Vimeo's participation in the video viewing process.

65. Vimeo allows OTT Websites to "customize the colors of the player, remove Vimeo branding, add their own logo, and toggle on or off specific controls for viewers."[18]

66. Once changes are made to the design of the OTT Website, the OTT Platform makes the OTT Website code adjustments for the OTT Website owners and applies the changes to the published or publicly accessible OTT Website.

67. Thus, while the OTT Website owners visually edit the website, the code is generated, hosted, and delivered to Subscribers by Vimeo.

68. The URL of an OTT Website can also be customized. Vimeo provides instructions for OTT Websites to operate behind a custom domain by making "DNS configurations that re-route [the OTT Websites'] customers" to a custom domain name using "an ALIAS or ANAME record."

69. Put another way, Vimeo instructs OTT Website owners how to conceal Vimeo's involvement in the video services on the OTT Websites.

**A. Vimeo Implements Tracking Tools Into Its OTT Platform to Gather and Transmit Sensitive Information**

70. Vimeo integrates Tracking Tools into its OTT Platform.

---

[16] *Id.*
[17] *Id.*
[18] *Your ad-free, customizable, high-quality player*, VIMEO, https://vimeo.com/features/video-player (last visited on Feb. 13, 2026).

71. These Tracking Tools track, intercept, and disclose Subscribers' activity on the OTT Websites, including their PII, IP address, search terms, and browsing history (Sensitive Information) for Vimeo's and the Tracking Entities' monetary gain.

72. For example, Vimeo uses the Sensitive Information to serve targeted advertising, build Subscriber profiles, and share data with Third-Party tracking partners for monetization. The OTT Websites can access the resulting analytics and use them to monitor viewer behavior, measure marketing performance, and optimize content delivery.[19]

73. Vimeo implements Tracking Tools on OTT Websites in coordination with the OTT Website owners. Vimeo obtains Tracking Tool details, including pixel IDs, from OTT Website owners, then creates and inserts the Tracking Tool code into the OTT Websites as part of its OTT Platform services. In addition, Vimeo enables integration with Google Tag Manager, which allows OTT Website owners to add additional Tracking Tools, including tools not natively supported by the OTT Platform.[20] This arrangement provides mutual commercial benefits for both Vimeo and OTT Website owners. Vimeo's integration of Tracking Tools allows OTT Website owners to observe and analyze Subscriber engagement with video content, which can be used to improve content offerings and delivery. Vimeo, in turn, derives financial benefit from increased Subscriber engagement, as it receives a share of revenue from subscriptions, rentals, and other transactions conducted through the OTT Platform.

---

[19] *Add tracking pixels to your Vimeo OTT checkout page*, VIMEO, https://help.vimeo.com/hc/en-us/articles/12427502043409-Add-tracking-pixels-to-your-Vimeo-OTT-checkout-page (last visited Feb. 10, 2026).

[20] *Google Tag Manager Integration*, VIMEO, https://help.vimeo.com/hc/en-us/articles/22098668654481-Google-Tag-Manager-Integration (last visited Feb. 10, 2026).

74. The OTT Platform is capable of tracking a host of Subscriber data.[21]

75. Indeed, Vimeo notes that the information collected from Subscribers includes Subscribers': (i) OTT Identification number, (ii) email, (iii) first name, (iv) last name, (v) city, (vi) state, (vii) country, (viii) the OTT ID of the first product purchased/subscribed to; (ix) the name of the product purchased/subscribed to; (x) actions taken, including subscriptions, rentals, purchases, follows, and registrations; (xi) the property of the actions, including invites sent by OTT Website staff, coupons, free access programs, purchases, newsletter signups without purchases, app and API purchases, and gifts; (xii) current product status, including whether a subscription has been paused, canceled, refunded, expired, disabled, etc.; (xiii) device(s) used to subscribe/purchase; (xiv) data related to when the Subscriber last interacted with the OTT Website; (xv) when the Subscriber's account was created; (xvi) expected date of expiration; and (xvii) opt-in status for marketing emails or texts.[22]

76. The data from this tracking "is contained within the Vimeo OTT Dashboard, which [OTT Websites will] see when [they] log in" to their OTT Website.[23]

77. Vimeo collects this information from "anywhere [the] videos are embedded from one, central dashboard."[24]

78. Vimeo uses the information it collects from OTT Website Subscribers, in part, to communicate with them, to market content to them, and to improve Subscribers' engagement

---

[21] *Types of data & analytics provided by Vimeo OTT*, VIMEO, https://help.vimeo.com/hc/en-us/articles/12427247662737-Types-of-data-analytics-provided-by-Vimeo-OTT (last visited Feb. 10, 2026).
[22] *What's included in your Customers CSV on Vimeo OTT*, VIMEO, https://help.vimeo.com/hc/en-us/articles/12427304383889-What-s-included-in-your-Customers-CSV-on-Vimeo-OTT (last visited Feb. 10, 2026).
[23] *Types of data & analytics provided by Vimeo OTT*, VIMEO, (last visited Feb. 10, 2026).
[24] *Track video analytics*, VIMEO, https://vimeo.com/features/video-analytics (last visited Feb. 10, 2026).

with the OTT Websites.[25] Greater Subscriber engagement contributes to longer subscription periods and increases purchase activity on OTT Websites. It also allows Vimeo to gather more detailed behavioral data, which improves its ad targeting capabilities and increases its value to third-party advertisers. Considering Vimeo's revenue sharing[26] and subscription[27] models, increased engagement on the OTT Websites benefits Vimeo, the OTT Websites, and Third-Party advertisers financially.

79. Vimeo sends emails to OTT Website Subscribers who have opted in to receive new content notifications and signs those emails with the OTT Website's "Site Title," while omitting any reference to "Vimeo OTT."[28]

80. Vimeo and the OTT Website owners also transmit the collected data to various third-party platforms, where the information is analyzed to improve their marketing efforts.[29] This data allows both Vimeo and the OTT Websites to refine Subscriber profiles and improve marketing performance.

81. Vimeo states that a portion of its business involves "us[ing] and disclos[ing]" subscriber "personal information" in a way that may constitute Selling and/or Sharing, as well as

---

[25] *See generally OTT customer management and outreach,* VIMEO, https://help.vimeo.com/hc/en-us/sections/12402581147665-OTT-customer-management-and-outreach (last visited Feb. 10, 2026).

[26] *Vimeo OTT pricing breakdown*, VIMEO, https://help.vimeo.com/hc/en-us/articles/12425768622481-Vimeo-OTT-pricing-breakdown (last visited Feb. 10, 2026) (noting that Vimeo OTT is a "revenue-share-based service" where Vimeo makes $1 per subscriber a month, plus merchant fees of 2.5% on transactions, 10% revenue sharing on the sale of buy/rent products, and an additional fixed fee of $0.50 per transaction for buy/rent products).

[27] *Plans that grow with your subscribers*, VIMEO, https://vimeo.com/ott/pricing (last visited Feb. 10, 2026) (noting that Enterprise Vimeo OTT subscribers can pay a "monthly or yearly subscription" for access to the OTT Platform, with access to additional features on the OTT Platform.

[28] *Customer email notifications for Vimeo OTT*, VIMEO, https://help.vimeo.com/hc/en-us/articles/12427224110097-Customer-email-notifications-for-Vimeo-OTT (last visited Feb. 10, 2026).

[29] *See Using Segment with Vimeo OTT*, VIMEO, https://help.vimeo.com/hc/en-us/articles/12427547029649-Using-Segment-with-Vimeo-OTT (last visited Feb. 10, 2026) (noting the service is used to receive large amounts of data and "simultaneously re-route it to a myriad of destinations" for "user management and data insights that can't all be directly integrated into the Vimeo OTT platform").

17

"Processing" of information "for purposes of Targeted Advertising[,]"[30] including that it may sell information as defined by the California Consumer Privacy Act (CCPA).[31]

82.　　The CCPA defines "selling" as the "selling, renting, releasing, disclosing, disseminating, making available, transferring, or otherwise communicating . . . by electronic or other means, a consumer's personal information . . . to a third party for monetary or other valuable consideration." Cal Civ. Code § 1798.140(ad).

**III.　Vimeo Violates the VPPA**

83.　　Vimeo integrates multiple Tracking Tools into its OTT Platform, including the VHX Tool, the Meta Pixel, and Google Analytics. These tools collect and transmit data about the video content viewed by Subscribers on OTT Websites. The data is shared with Tracking Entities, without the knowledge or consent of Subscribers.

84.　　The Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, prohibits a video service provider from knowingly disclosing personally identifiable information that links a consumer to specific video content requested or obtained ("PII"). The statute protects individuals from unauthorized disclosures of their viewing history.

85.　　Vimeo's Tracking Tools capture and disclose Subscriber information, including information that identifies specific Subscribers and also connects them to particular video titles requested and/or viewed on the OTT Websites (PII). This PII includes names, email addresses, or unique identifiers that are sufficient to link a Subscriber to their video activity. As a result, Vimeo has violated the VPPA by disclosing protected video activity to Third Parties.

---

[30] *U.S. State Privacy Notice*, VIMEO, https://vimeo.com/legal/privacy/us-state-notice (last visited Feb. 10, 2026).

[31] *Does Vimeo sell my data*, VIMEO, https://help.vimeo.com/hc/en-us/articles/17229487725713-Does-Vimeo-sell-my-data (last visited Feb. 10, 2026) ("When you use our services, we may share your personal information with advertising partners in a way that may constitute a sale under the CCPA.").

**A.      The Meta Pixel**

86.      The Meta Pixel is a sophisticated piece of computer code, embedded in the HTML of a website. It is designed by Meta Platforms Inc. ("Meta" or "Facebook") to monitor user activity across the internet and transmit that activity to Meta for commercial purposes.

87.      The Meta Pixel tracks interactions on webpages, including button clicks, search queries, page loads, and cart additions. These interactions are defined and configured by the website operator.

88.      The Meta Pixel also tracks Subscribers' IP addresses, dispatching them to Meta and identifying the source of the communication.[32] This data can be viewed via an internet browser's developer console as it is transmitted to Meta.

89.      Meta processes the data transmitted through the Meta Pixel and uses it to generate marketing insights. These insights are used to target Facebook users with advertising and to measure the performance of advertising campaigns.

90.      Website developers must intentionally add the Meta Pixel to a website. To use the Meta Pixel, a website owner or operator must link it to a Facebook account and insert specific code into the website.[33]

---

[32] *See Meta Pixel*, META, https://developers.facebook.com/docs/meta-pixel/ (last visited Feb. 10, 2026) ("The Meta Pixel can collect . . . data like IP addresses, information about the web browser, page location, document, referrer and person using the website"); *Customer Information Parameters*, META, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/customer-information-parameters/ (last visited Feb. 10, 2026) (noting "IP address of the browser corresponding to the event . . . is automatically added to events sent through the browser . . . .").

[33]      *Set      up      and      install      the      Meta      Pixel*,      FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Feb. 10, 2026).

91.     Vimeo facilitates this process for OTT Website owners as part of its OTT Platform services. Vimeo crafted a step-by-step process for OTT Websites to incorporate the Meta Pixel and integrated it into its OTT Platform, making the implementation of the Meta Pixel seamless.

92.     During the setup process, Vimeo prompts OTT Website owners to enter their Meta Pixel IDs into the OTT Platform. [34]

93.     Once entered, the OTT Platform automatically generates and installs the Meta Pixel code into the OTT Website.

94.     Once embedded on OTT Websites by Vimeo's OTT Platform, the Meta Pixel collects Subscribers' information[35] from their web browsers and sends it to Meta.[36] This process occurs on the devices Subscribers use to access these websites.[37] Meta, the OTT Website owners, and Third Parties use this data to create user profiles and target Subscribers with advertising. The goal of this data exchange is to increase engagement and convert visitors into paying Subscribers. Vimeo's integration of the Meta Pixel facilitates this process for its financial benefit and the benefit of its advertising partners.[38]

---

[34] *Add tracking pixels to your Vimeo OTT checkout page*, VIMEO, https://help.vimeo.com/hc/en-us/articles/12427502043409-Add-tracking-pixels-to-your-Vimeo-OTT-checkout-page (last visited Feb. 10, 2026).

[35] Aside from detailed URLs, and metadata, this information also includes IP addresses. *See Customer Information Parameters,* META*,* https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/customer-information-parameters (noting the user's IP address "is automatically added to events sent through the browser")(last visited Feb. 10, 2026).

[36] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta Pixel*, META, https://developers.facebook.com/docs/meta-pixel/ (last visited Feb. 10, 2026).

[37] *Id.*

[38] *See Introduction: What is the Meta Pixel?*, META, https://www.facebook.com/business/tools/meta-pixel (last visited Feb. 10, 2026).

### 1. The Meta Pixel Shares Subscribers' Sensitive Information

95. The Meta Pixel is a line of JavaScript code that is embedded into webpages. When placed on a webpage, it begins to monitor Subscriber behavior and send information about those interactions to Meta. This happens through the Subscriber's web browser and occurs in real time, without the Subscriber being informed or asked for consent.

96. The Meta Pixel records a range of Subscriber actions, including clicks, searches, scrolling, video plays, and page visits. These actions are automatically tracked by Meta Pixel once it has been activated on the website. Vimeo enables this by including the Meta Pixel in its website setup tools and allowing OTT Website owners to apply it across their pages without the need for directly adding the Pixel code to the webpages. It prompts the OTT Website owner to enter a Pixel ID – unique identifier – and then deploys the tracking script across all applicable pages. This includes pages that host or display video content, as well as pages that allow Subscribers to search for or subscribe to the site.

97. The information sent by the Meta Pixel includes the full web address of the page the Subscriber is visiting and the specific events that occurred during that visit. This includes whether the Subscriber watched a video and what the title of the video was. The URL itself includes this information and is embedded in the request sent to Meta. This happens automatically without the Subscribers' input or awareness. For OTT Websites using the Vimeo Platform, the URLs that Subscribers visit often include the specific title of the video being accessed. These URLs are captured by the Meta Pixel and transmitted to Meta in full, including the video title embedded in the string. This enables Meta to identify both the Subscriber and the exact video watched, which constitutes PII under the VPPA.

98. One of the cookies transmitted by the Pixel is the c_user cookie, which contains the Subscriber's unique, unencrypted Facebook account identifier (the FID).[39] Anyone with the FID can use it to identify the Subscriber's Facebook account by appending the value to the end of "facebook.com/." This value is sent along with data about what the Subscriber watched or searched for. Meta receives both the content information and the identifier in the same transmission. The Subscriber is not informed that this is happening and is given no opportunity to opt out or block it.

99. Meta uses this data to link off-site behavior to Facebook Subscriber profiles. It uses the information to deliver targeted advertising, track the effectiveness of campaigns, and adjust the content shown to the Subscriber on Meta's platforms. This process allows Meta to associate specific video content with individual Facebook users (and Subscribers). This integration benefits both Meta and Vimeo. Meta profits by enhancing its advertising targeting and attribution systems, while Vimeo benefits from increased engagement and more refined Subscriber analytics, which are shared with OTT Website owners. These analytics include detailed engagement reports based on data collected through the Meta Pixel.

100. In addition, the Meta Pixel transmits a series of cookies that are used to identify Facebook Subscribers, such as the "fr" cookie and the "datr" cookie.

101. Each of these cookies contains a different identifier, each serving a distinct function in identifying or tracking the Subscribers across sites:

---

[39] *Common cookies and uses*, FACEBOOK, https://www.facebook.com/privacy/policies/cookies/?annotations%5b0%5d=explanation%2F1_common _cookies_and_uses (last visited Feb. 10, 2026).

    a.    The "fr" cookie contains an encrypted FID and browser ID, and has a lifetime of 90 days on a Subscriber's device before needing to be replaced.[40]

    b.    The "datr" cookie (collectively with the "fr" cookie and the c_user cookie, the "Meta Cookies") contains "a unique identifier for [a user's] browser . . . [and] has a lifespan of two years."[41]

102.    As demonstrated through *Figures 1* and *2* below, anyone can use a FID, contained in the c_user cookie, to identify a Facebook user. An FID is personally identifiable information.[42] It contains a series of numbers used to identify a specific profile, as depicted below:

*Figure 1 - Sample c_user ID number of test account created by Plaintiffs' Counsel to investigate the Pixel, captured by a Pixel event from a previous investigation*

---

[40] *See Cookie Policy*, BMW, https://bavarianmotorcars.com/en/cookie-policy (last visited Dec. 3, 2025); *Advertising, recommendations, insights and measurement*, META, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3 (last visited Feb. 10, 2026).

[41] *Security, site and product integrity*, META, https://www.facebook.com/privacy/policies/cookies/version/cookie_policy_2022/?subpage=subpage-1.2 (last visited Feb. 10, 2026).

[42] *See, e.g., Robinson v. Disney Online*, 152 F. Supp. 3d 176, 184 (S.D.N.Y. 2015) (holding a FID is PII); *Lamb v. Forbes Media* LLC, No. 22-cv-06319-ALC, 2023 WL 6318033, at *10-11 (S.D.N.Y. Sept. 28, 2023) (same); *Stark v. Patreon*, 635 F. Supp. 3d 841, 853-54 (N.D. Cal. 2022) (same); *Czarnionka v. Epoch Times Ass'n Inc.*, No. 22 CIV.6348 (AKH), 2022 WL 17718689, at *1-2 (S.D.N.Y. Dec. 15, 2022) (same); *Belozerov v. Gannett Co., Inc.*, 646 F. Supp. 3d 310, 314-15 (D. Mass. 2022) (same); *Lebakken v. WebMD LLC*, 640 F. Supp. 3d 1335 (N.D. Ga. 2022) (same).

103. A FID can be used by anyone to easily identify a Facebook user by simply appending the FID to www.facebook.com (*e.g.*, www.facebook.com/[FID_here]). Using the FID from *Figure 1*, appending it to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) will redirect the webpage straight to the Facebook profile associated with the FID, as depicted below:



*Figure 2 – Appending FID from Figure 1 to "facebook.com/" results in the user being redirected to this sample Facebook account created by Plaintiffs' Counsel to investigate the Pixel, captured by a Pixel event from a previous investigation*

104. Facebook profile information – name, gender, profile photo, cover photo, username, user ID (account number), age range, language, and country – is "always public."[43]

---

[43] *Control who can see what you share on Facebook*, META, https://www.facebook.com/help/1297502253597210 (last visited Feb. 10, 2026).

105. Meta's privacy settings do not allow Facebook users to hide this basic information.

106. Meta Cookies "help [Meta] to provide insights about the people who use the Meta Products, as well as the people who interact with the ads, websites and apps of our advertisers and the business that use the Meta Products."[44]

107. Meta Cookies also "enable Meta to offer the Meta Products to [users] and to understand the information that [it] receive[s] about [users], including information about [their] use of other websites and apps, whether or not [they] are registered or logged in."[45]

108. This information is sent "solely to match the Contact Information against user IDs . . . as well as to combine those user IDs with corresponding Event Data."[46]

109. Meta explains that "Contact Information" is information that personally identifies individuals . . . ." and "Event Data" is "information that [websites] share about people and the actions that they take on your websites and apps . . . such as visits to your sites . . . and purchases of your products."[47]

110. In short, Meta can identify specific Facebook accounts and their owners using Meta Cookies transmitted by the Meta Pixel and match those accounts to the Event Data being intercepted. This link between a known user ID and specific video interactions (PII) constitutes a disclosure of video requests under the VPPA.

111. The Meta Pixel implemented on the OTT Websites compels Subscribers' browsers to disclose Meta Cookies, including the c_user cookie, alongside video-viewing activity for OTT

---

[44] *Advertising, recommendations, insights and measurement*, META, https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3 (last visited Feb. 10, 2026).
[45] *Cookies Policy: What are cookies, and what does this policy cover?*, META (Dec. 12, 2023), https://www.facebook.com/privacy/policies/cookies (last visited Feb. 10, 2026).
[46] *Meta Business Tools Terms*, META (Nov. 3, 2025) https://www.facebook.com/legal/technology_terms (last visited Feb. 10, 2026).
[47] *Id.*

Website webpages containing video materials. OTT Websites using the Meta Pixel knowingly disclose information sufficiently permitting an ordinary person to identify what video a specific individual Subscriber has streamed, especially when the Subscriber is logged into Facebook at the time of viewing.

112. When the Cookies are in place, including the c_user cookie, the Meta Pixel copies the Cookie into the request header.

113. PageView events, when triggered, independently and automatically result in the sharing of Subscribers' website interactions (including video watching activity data) and FID with Facebook.

114. Plaintiffs' and Class Members' Sensitive Information has automatically been shared with Facebook because of Vimeo's decision to offer the Meta Pixel to the OTT Websites. Because video-watching data is transmitted alongside a unique Facebook identifier, this practice constitutes a knowing disclosure of personally identifiable information, as defined under and in violation of the VPPA.

**B.      The VHX Tool Shares Subscribers' Sensitive Information**

115. The Vimeo OTT Platform was formed through Vimeo's acquisition of VHX, a digital distribution platform that allowed video creators to sell videos directly to Subscribers from their apps and websites.[48]

---

[48] *Vimeo + VHX = good things for all*, VIMEO (May 2, 2016), https://vimeo.com/blog/post/vimeo-vhx-good-things-for-all (last visited Feb. 10, 2026); *VHX is now Vimeo OTT*, VIMEO, https://vimeo.com/ott/vhx (last visited Feb. 10, 2026).

116. OTT Websites interface with the Vimeo OTT Platform through the Vimeo OTT application programming interface ("API"), which was previously referred to as the "VHX API."[49]

117. OTT Website owners use this VHX API to manage their websites, Subscribers, videos, live events, comments, and website analytics.[50]

118. Vimeo's own VHX Tracking Tool ("VHX" or "VHX Tool") is also integrated into OTT Websites to monitor Subscriber activity, including which webpages a Subscriber visits, when those webpages were published, and which videos a Subscriber interacts with. VHX operates invisibly in the background of the OTT Websites. When a Subscriber visits a webpage, VHX records the visit and attaches a unique identifier to that Subscriber's session. These identifiers, tied to email addresses or other account-level information, are transmitted back to Vimeo along with details about the Subscriber's interactions with the page.

119. VHX discloses Subscribers' video activity data and identities (including through their email addresses) to Vimeo, as demonstrated by *Figures 3* and *4* below. This information includes the title of the video accessed, the page where it was viewed, and the identifying credentials of the Subscriber.

---

[49] *API*, VIMEO, https://dev.vhx.tv/docs/api/ (last visited Feb. 10, 2026).
[50] *API: Introduction*, VIMEO, https://dev.vhx.tv/docs/api/#introduction (last visited Feb. 10, 2026).



*Figure 3 - Webpage of sample video on the WOW Presents Plus OTT Website ("Bring Back My Girls Season 4") viewed on a desktop*



*Figure 4 – VHX transmitting video title ("Bring Back My Girls Season 4") and unencrypted email (redacted)[51] and user identification assigned by WOW Presents OTT Website after visiting webpage from Figure 3*

---

[51] *See Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 986 (9th Cir. 2017) ("A Facebook link or an email address may very well readily enable an 'ordinary person' to identify an individual.").

120. Plaintiffs' and Class Members' Sensitive Information has automatically been shared with Vimeo as a result of Vimeo's integration of its own VHX into the OTT Platform. The information disclosed by the VHX includes URLs identifying the video being watched and unique identifiers such as the Subscriber's email address. These transmissions link specific individual Subscribers to specific video content and are automatically sent to Vimeo. Such disclosure of Sensitive Information violates the VPPA.

121. Vimeo subsequently uses Subscribers' Sensitive Information for its personal benefit, including by selling or sharing that information with advertising partners for commercial purposes.[52] Vimeo profits from this data in multiple ways, including the development of engagement reports provided to OTT Website owners and through targeted advertising campaigns conducted via partnerships with marketing and analytics firms. In this way, Vimeo leverages its access to Subscribers' Sensitive Information to enhance its own revenue streams.

**C.     Sign-up for the OTT Websites' Subscriptions Lacks Informed, Written Consent Pursuant to the VPPA**

122. Vimeo's policies do not include language sufficient to warn Subscribers that their video-watching activity data and other Sensitive Information will be disclosed to Third Parties.

123. The OTT Websites do not present Subscribers with an opportunity to provide informed, written consent as required by the VPPA. Consent to share a Subscriber's PII is not: (i) clearly disclosed in a transparent or conspicuous manner; (ii) offered through a checkbox, e-signature, or other form of affirmative, written agreement; or (iii) separated from the general privacy policy in a distinct form.

---

[52] Vimeo admits its uses "personal information with advertising partners in a way that may constitute a sale under the CCPA." *Does Vimeo sell my data*, VIMEO, (last visited Feb. 10, 2026).

124. Vimeo does not obtain consent from OTT Website Subscribers to collect and disclose their PII. Vimeo's Tracking Tools, including the VHX, are embedded directly into the video players used across the OTT Platform and operate automatically without notice to or authorization from the Subscriber.

125. Vimeo's role in designing and operating the technical infrastructure of the OTT Websites is not disclosed to Subscribers. OTT Website privacy policies typically omit any reference to Vimeo or its Tracking Tools. As a result, Subscribers are not made aware of Vimeo's role and cannot provide the informed, written consent required under the VPPA.

**IV.** **Defendant, Through the OTT Platform, Violates Wiretap Statutes**

126. Vimeo provides OTT Website operators with a search bar interface (the "Search Bar") through which Subscribers can search for videos, collections, and other subscription content. The Search Bar functionality provided by Vimeo is uniform across all OTT Websites hosted on its OTT Platform. Although each OTT Website appears independently branded, the underlying Search Bar is developed, operated, and maintained by Vimeo.

127. When a Subscriber types a search term into the Search Bar on an OTT Website, the Subscriber reasonably believes that the search is private and directed solely to that specific website, not shared with or observed by outside entities.

128. "Customers can search the OTT site via the Search Bar in the top navigation" which will "display any relevant collection, videos, or products listed on the platform."[53]

---

[53] *Customer-facing search on Vimeo OTT*, VIMEO, https://help.vimeo.com/hc/en-us/articles/12427213378705-Customer-facing-search-on-Vimeo-OTT (last visited Feb. 10, 2026).

129.    When a Subscriber searches the OTT Website, the "videos, collections and products that are part of an active subscription will be compared to the title, description, short description, genres, cast, crew, and tags that [the OTT Website owner] ha[s] supplied."[54]

130.    Vimeo explains that metadata fields on the OTT Websites' videos and collections "will also help . . . customers discover new content."[55]

131.    Unbeknownst to Subscribers, however, Defendant's VHX and other Tracking Tools are secretly integrated into the OTT Websites' code, causing Subscribers' search terms to be intercepted and transmitted to Vimeo and the Tracking Entities.

132.    These Tracking Tools intercept the search terms and transmit them to Vimeo and the Tracking Entities at the very moment a Subscriber submits a search query. This occurs contemporaneously or near contemporaneously with the OTT Website's own receipt of that search, thereby constituting an interception of the contents of an electronic communication within the meaning of 18 U.S.C. § 2510(4) and (8).

133.    The Search Bar interface that appears on the WOW Presents Plus Website is an implementation of Vimeo's Search Bar. Nothing about its appearance informs Subscribers that Vimeo is operating or monitoring the Search Bar.

134.    At all times – before, during, and after a search is performed – the OTT Websites provide no visible indication that Vimeo is involved in collecting or transmitting the search data.

**A.    Plaintiffs Have a Privacy Right in Their Search Terms**

135.    Subscribers search for video materials on the OTT Websites using search terms.

---

[54] *Id.*
[55] *Id.*

136. Subscriber-entered search terms are inherently private because they reflect personal interests, concerns, and behaviors. Privacy concerns intensify when searches reveal information related to Subscribers' health, financial, or personal interests.

137. When Subscribers search for videos on OTT platforms, the search terms often directly link to specific titles of video content or content descriptions, meaning the information is more revealing than general browsing behavior.

138. Titles, descriptions, and summaries of pre-recorded audiovisual content searched for by Subscribers are legally protected under the VPPA.

139. The OTT Websites do not notify Subscribers that their search terms will be surreptitiously intercepted by Vimeo and other Tracking Entities when conducting searches on the OTT Websites. There is no watermark, banner, attribution, or disclaimer anywhere near the Search Bar indicating that search activity will be monitored, logged, or shared with Third Parties.



*Figure 5 – An illustrative example of a Search Bar on the OTT Website, WOW Presents Plus, as viewed on a desktop*

140. Even after a search is run, and even after the results screen appears, the Search Bar still hides Vimeo's involvement. This is depicted below:



*Figure 6 – An example of search results after searching "Happily ever laughter" in the WOW Presents Plus OTT Website's Search Bar, as viewed on desktop*

141.    The Search Bar implemented on each of the OTT Websites behaves identically.

**B.     Vimeo Utilized the Meta Pixel to Monetize Subscribers' Search Terms**

142.    As described above in Section III(A), the Meta Pixel captures information via triggered browser events and transmits it to Meta.

143.    This includes data passed via URL requests, Meta Cookies, and metadata sent to Meta, which contains Subscriber activity data.

144.    The Meta Pixel specifically intercepts and transmits Subscribers' search terms— text that Subscribers enter into OTT Websites' Search Bars when looking for video content.

145.    This interception occurs regardless of whether a Subscriber arrives at the video content through a search, the homepage, a link, or other navigation path.

146.    Because these search terms are tied to video content searches, each search both reveals confidential information and results in the transmission of PII, which constitutes a violation of the VPPA and applicable wiretap statutes.

147.    When a Subscriber submits search terms through an OTT Website's Search Bar, those terms are intercepted and monetized by Meta and other Tracking Entities. Meta uses the intercepted search terms to create or refine Subscriber profiles that can be targeted with

personalized ads across Meta-owned platforms and third-party websites. This monetization benefits Meta, Vimeo, and advertisers, while depriving Subscribers of control over their private search behavior.

### C. Vimeo Utilizes Its VHX to Monetize Subscribers' Search Terms

148. Through the OTT Platform, Vimeo offers OTT Website owners access to a statistical tracking platform that was developed in-house.[56]

149. Vimeo highlights that OTT Website owners "having access to and filtering information about [their] customers is critical for long-term success."[57]

150. The Vimeo OTT Customers Page provides insight into different segments of customers, allowing OTT Website owners to formulate and enact campaigns and outreach based on Subscriber activity.[58]

151. The Vimeo Subscribers Report provides data on total active subscriptions and/or free trials, churn rates, average revenue, and free trial conversion rates, among other things.[59]

152. The Vimeo Viewership Report provides data on total views, total time watched, number of unique times a video is finished, the platforms on which Subscribers watch content, and the countries in which Subscribers watch content, among other things.[60]

---

[56] *See Managing your customers on Vimeo OTT*, VIMEO, https://help.vimeo.com/hc/en-us/articles/12427213530257-Managing-your-customers-on-Vimeo-OTT (last visited Feb. 10, 2026, 2025).

[57] *Id.*

[58] *Id.*

[59] *Subscribers Report on Vimeo OTT*, VIMEO, https://help.vimeo.com/hc/en-us/articles/12427225171217-Subscribers-Report-on-Vimeo-OTT#h_01FX2CNVX6N7MWAZPEX5GJECQA (last visited Feb. 10, 2026).

[60] *Viewership Report on Vimeo OTT*, VIMEO, https://help.vimeo.com/hc/en-us/articles/12427239858321-Viewership-Report-on-Vimeo-OTT (last visited Feb. 10, 2026).

153.    To collect this data, there are two primary methods: data entered directly into the OTT Admin site[61] and data collected through VHX.

154.    As discussed in Section III(B), VHX is loaded onto Subscribers' browsers, and monitors Subscriber activity, including the names of the webpage URLs being viewed, the webpage that led the Subscriber to the current webpage, the path[62] of the webpage, the video ID associated with the video content present on the webpage, whether a specific video is viewed, and various other internally tracked ID numbers and information categories, as depicted below:



*Figure 7 - Sample of payload of VHX transmission (user email redacted) to demonstrate the information VHX collects*

---

[61]    *Managing your customers on Vimeo OTT*, VIMEO, https://help.vimeo.com/hc/en-us/articles/12427213530257-Managing-your-customers-on-Vimeo-OTT (last visited Feb. 10, 2026).

[62] The location of the webpage within the various folders of documents contained in the server hosting the webpage. *See URL: pathname property*, MOZILLA, https://developer.mozilla.org/en-US/docs/Web/API/URL/pathname (last visited Feb. 10, 2026).

155. Some of this information is gathered as soon as the VHX code loads onto a Subscriber's browser, while other elements, such as play and pause information for specific videos, are only gathered when a Subscriber clicks a button on Vimeo's media player.[63]

156. In addition, VHX intercepts and captures Subscribers' search terms submitted through the OTT Website's Search Bar, as depicted below:[64]



*Figure 8 - VHX intercepting search term "Chronicles" after sample search conducted on the Master Lectures OTT Website*

157. This collected information is not sent to the individual OTT Website owners. Instead, this information is sent by VHX to api.vhx.com and aggregated by Vimeo for its own purposes; i.e., to sell, or otherwise benefit from, Subscribers' Sensitive Information.[65] Vimeo uses the data it collects from the OTT Websites it powers to create detailed records of what Subscribers

---

[63] *See Getting Started - Events,* VIMEO, https://dev.vhx.tv/player/ (last visited Feb. 10, 2026).
[64] Here, a test search was made using the terms "Chronicles."
[65] *See Does Vimeo sell my data?*, VIMEO, (last visited Feb. 10, 2026).

watch and search for. Vimeo combines this information across multiple websites to build profiles of Subscribers' viewing habits and interests. Vimeo then uses those profiles to generate revenue, including by sharing data with advertisers, delivering targeted ads to Subscribers, and developing new products and services based on Subscriber behavior. This conduct is separate from simply helping OTT Websites host video content. Vimeo collects this data through hidden Tracking Tools and uses it for its own commercial purposes.

### D. Vimeo Utilizes Google Tracking Tools to Monetize Subscribers' Search Terms

158. Google offers an array of advertising products, each serving a specific function in advertising portfolios.

159. A large source of revenue for Google comes from its search ads, a Google product called Google Ads (formerly AdWords), which accounted for $162.45 billion of Google's $279.81 billion of revenue in 2022.[66] As recently as 2020, almost 80 percent of Alphabet's revenue, Google's parent company, came from Google ad-related products.[67] Google collects 30 cents for every dollar that advertisers spend through its various tools across the internet.[68] Google is the global leader in advertising revenue generation worldwide,[69] surpassing both Meta and

---

[66] *How Does Google Make Money?*, OBERLO, https://www.oberlo.com/statistics/how-does-google-make-money#:~:text=Google%20revenue%20breakdown%3A%20top%20five,billion%20came%20from%20search%20ads (last visited Feb. 10, 2026).

[67] Megan Graham and Jennifer Elias, *How Google's $150 billion advertising business works*, CNBC (Oct. 13, 2021), https://www.cnbc.com/2021/05/18/how-does-google-make-money-advertising-business-breakdown-.html (last visited Feb. 10, 2026).

[68] *Google accused of monopolizing $250B U.S. digital ad market*, POLITICO, https://www.politico.com/news/2023/01/24/new-doj-lawsuit-could-break-up-google-00079229 (last visited Feb. 10, 2026).

[69] *Advertising revenue of major digital ad-selling companies worldwide in 2025*, STATISTA, https://www.statista.com/statistics/1202672/digital-ad-revenue-ad-selling-companies-worldwide/#:~:text=Ad%20revenue%20of%20major%20digital%20ad%20sellers%20worldwide%202020 22&text=In%202022%2C%20Google%20was%20forecast,leading%20digital%20ad%20sellers%20worl dwide (last visited Feb. 10, 2026).

Amazon. Google's data collection infrastructure, including its Analytics and Tag Manager products, is designed not only to provide reports to website operators but also to fuel Google's own advertising business. The Subscriber data collected by OTT Websites flows into Google's broader advertising ecosystem, enabling behavioral profiling and ad targeting across devices and websites.

### 1. Google Analytics

160. Google Analytics ("GA") is a product that can be integrated directly into OTT Websites.[70]

161. Like pixels, GA collects data about Subscribers' interactions with a website to create reports that provide insights into the businesses that employ it.[71]

162. GA's default configuration collects Subscribers' actions such as clicks, ad views, scroll depth, search queries entered on the website, including search terms related to video content, and events related to the starting and stopping of video playback.[72]

163. The data collected through GA is sent back to Google, which aggregates and organizes the data into reports.[73]

164. GA also collects predefined attributes about the Subscriber, such as browser type, geographic location, language, device type, age, gender, and stated online interests.

---

[70] *See Integrate the Vimeo player with Google Analytics*, VIMEO, https://help.vimeo.com/hc/en-us/articles/12426206785553-Integrate-the-Vimeo-player-with-Google-Analytics (last visited Feb. 10, 2026).

[71] *How Google Analytics works*, GOOGLE, https://support.google.com/analytics/answer/12159447?hl=en#:~:text=When%20the%20measurement%20code%20collects,Give%20feedback%20about%20this%20article (last visited Feb. 10, 2026).

[72] *[GA4] Predefined user dimensions*, GOOGLE, https://support.google.com/analytics/answer/9268042?visit_id=638786028074345074-2898709958&rd=2 (last visited Feb. 10, 2026).

[73] *How Google Analytics works*, GOOGLE, https://support.google.com/analytics/answer/12159447?hl=en#:~:text=When%20the%20measurement%20code%20collects,Give%20feedback%20about%20this%20article (last visited Feb. 10, 2026).

165. Google uses the collected data to create multiple categories of reports:

   a. Acquisition reports show how Subscribers land on a website, so website owners can better understand the effectiveness of their marketing.[74]

   b. Engagement reports show what content on a website drives engagement and conversions.[75]

   c. Monetization reports provide details on the revenue a website generates from ecommerce, subscriptions, or ads.[76]

166. These reports allow OTT Website owners to "fine-tune [their] digital strategy, optimize [their advertising] campaigns, and take [their] online presence to new heights."[77]

167. Google notifies web developers that "[i]t is your responsibility, as an advertiser, to understand the laws that affect you and to implement consent management solutions for any data you share with Google."[78]

168. These warnings acknowledge the legal implications of the default tracking behavior of GA and place the burden on website developers, such as Vimeo, to ensure compliance with applicable privacy laws. As part of this integration, Google receives Subscriber-generated search terms entered into the OTT Websites' Search Bars. These search terms reveal the specific video content a Subscriber is seeking and are transmitted alongside identifiers and metadata through the embedded Tracking Tools.

---

[74] *Analytics Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last visited Feb. 10, 2026).

[75] *Id.*

[76] *Id.*

[77] *Google Analytics: Start learning about Google Analytics*, GOOGLE, https://developers.google.com/analytics (last visited Feb. 10, 2026).

[78] *Introduction to user consent management*, GOOGLE, https://support.google.com/analytics/answer/12329599?hl=en (last visited Feb. 10, 2026).

169.   In this case, Vimeo added or permitted the integration of GA into OTT Websites. In doing so, Vimeo enabled the interception and transmission of Plaintiffs' and Class Members' search terms to Google, including search terms related to video content.

### 2.   Google Tags and Tag Manager

170.   Vimeo also makes use of the Google Tag Manager system.

171.   Like pixels, Google Tags collect data about Subscriber interactions with a website, including link clicks, button clicks, form submissions, conversions, shopping cart abandonment, adding items to carts, removing items from carts, file downloads, scrolling behavior, video views, call-to-action performance, table of contents clicks, and other customizable events.[79]

172.   Google Tags enable websites to send collected data to linked Google product destinations (such as Google Analytics or Google Ads accounts) to help measure website and advertising effectiveness.[80] The data sent from Google Tags are accessible and configurable from Google Ads and Google Analytics.[81]

173.   Website developers can use Google Tag IDs ("GID") to add Google Tags with specific Google products and services associated with the GID to websites.[82] GIDs often include the prefixes GT-XXXXXX, G-XXXXXX, and AW-XXXXXX.[83]

---

[79] Zach Paruch, *What Is Google Tag Manager & How Does It Work?*, SEMRUSH: BLOG (Jan. 4, 2024), https://www.semrush.com/blog/beginners-guide-to-google-tag-manager/ (last visited Feb. 10, 2026).
[80] *Tag Manager Help: About the Google tag*, GOOGLE, https://support.google.com/tagmanager/answer/11994839?hl=en (last visited Feb. 10, 2026).
[81] *Id.*
[82] *Id.*
[83] *Tag Manager Help: Google tag ID: Definition*, GOOGLE, https://support.google.com/tagmanager/answer/12326985?hl=en&ref_topic=12403939&sjid=14124967584070639073-NA (last visited Feb. 10, 2026).

174. A single Google Tag can reference multiple GIDs.[84] A single Google Tag can also be used to send data to multiple "destinations."[85]

175. Google defines "destinations" as Google measurement product accounts that share configuration setting with and receive data from Google Tags.[86]

176. Destinations can be added to a Google Tag to reuse the Tag's settings and simplify adding the Tag across multiple webpages.[87]

177. Similarly, destination IDs are used as identifiers to represent the destination of data sent by the Google Tag.[88] The Google Tag uses destination IDs to "load destination-specific settings and to route events."[89]

178. Notably, Google notifies web developers that they should provide "users with clear and comprehensive information about the data . . . collect[ed] on [their] websites" and to obtain "consent for that collection where legally required."[90]

179. Google itself is aware of the potential legal violations its data collection tools are capable of and puts the onus of warning Subscribers onto the website developers, such as Vimeo.[91]

180. Vimeo enables OTT Website owners to integrate Google Tags into OTT Websites via the OTT Platform. Once an OTT Website owner generates a Google Tag ID, the OTT Website

---

[84] *Id.*
[85] *Id.*
[86] *Id.*
[87] *Id.*
[88] *Id.*
[89] *Id.*
[90] *Id.*
[91] *See id.*

owner can "paste the full container ID under the Google Tag Manager Container ID"[92] text field in the "Tracking tab" of the OTT Platform. "Adding the tag will automatically add [the OTT Website owner's] GTM container to [the] OTT site which will begin tracking data immediately."[93]

181. In short, Vimeo added OTT Website owners' Google Tags to the OTT Websites. The Google Tags placed on the OTT Websites are capable of capturing Search Bar entries, video playback events, and other sensitive Subscriber interactions. These events are recorded in real time and routed to various Google products for aggregation, analysis, and use in targeted advertising strategies.

182. The GIDs on OTT Websites represent specific data collection practices and settings and pre-determined tracking tools being activated through the Google Tag, each sending the data collected to various destinations owned by the Tracking Entities, including Google.

183. After receiving Plaintiffs' and Class Members' data collected via the Google Tag Manager, Google provides analytics and reporting that allow Vimeo to monetize the information through the deployment of targeted advertising and content recommendations.

### 3. Google Fingerprinting

184. On December 19, 2024, Google announced that organizations using its advertising products can use fingerprinting techniques beginning on February 16, 2025.[94]

185. "Fingerprinting involves the collection of pieces of information about a device's software or hardware, which, when combined, can uniquely identify a particular device and user,"

---

[92] *Google Tag Manager Integration*, VIMEO, https://help.vimeo.com/hc/en-us/articles/22098668654481-Google-Tag-Manager-Integration (last visited Feb. 19, 2026).
[93] *Id.*
[94] Pieter Arntz, *Google now allows digital fingerprinting of its users*, MALWAREBYTES (Feb. 19, 2025), https://www.malwarebytes.com/blog/news/2025/02/google-now-allows-digital-fingerprinting-of-its-users (last visited Feb. 10, 2026).

explains Stephen Almond, executive director of regulatory risk at the International Commissioner's Office ("ICO").[95]

186.    Digital fingerprinting essentially creates a unique digital ID for a Subscriber and their device based on various pieces of information collected when you browse the internet, including a Subscriber's operating system (e.g., Windows, Android, iOS), browser type (e.g., Chrome, Safari, Firefox) and version, IP address, installed browser plugins, time zone, and language settings, among others.[96]

187.    In addition to device identifiers, fingerprinting ingests all of the websites and apps that the Subscriber uses, creating a detailed map for Google to follow and analyze, allowing a profile to be built of everything the Subscriber likes and is likely to buy.[97]

188.    Even Google has raised concerns about digital fingerprinting in the past, warning it "subverts user choice and is wrong."[98]

189.    In changing its policy regarding fingerprinting, Google vaguely claims it is investing in privacy-enhancing technologies (PETs) to protect users' privacy, providing few specifics about how PETs do so.[99]

---

[95] Stephen Almond, *Our response to Google's policy change on fingerprinting*, INT'L COMMISSIONER'S OFFICE (Dec. 19, 2024), https://ico.org.uk/about-the-ico/media-centre/news-and-blogs/2024/12/our-response-to-google-s-policy-change-on-fingerprinting/ (last visited Feb. 10, 2026).

[96] Pieter Arntz, *Google now allows digital fingerprinting of its users*, MALWAREBYTES (Feb. 19, 2025), (last visited Feb. 10, 2026).

[97] Zak Doffman, *Google's Fingerprinting Returns in 8 Weeks And It Will Track Your Devices*, FORBES (Dec. 21, 2024 2:37 PM), https://www.forbes.com/sites/zakdoffman/2024/12/21/forget-chrome-google-will-start-tracking-you-and-all-your-smart-devices-in-8-weeks/ (last visited Feb. 10, 2026); Zak Doffman, *Google Starts Fingerprinting Your Devices in 10 Days*, FORBES (Feb. 8, 2025), https://www.forbes.com/sites/zakdoffman/2025/02/08/forget-chrome-google-starts-tracking-all-your-devices-in-10-days/ (last visited Feb. 10, 2026).

[98] *Id.*

[99] *Id.*

43

190.    The ICO finds fingerprinting an unfair means of tracking users online, "because it is likely to reduce people's choice and control over how their information is collected."[100]

191.    The ICO explains:

> [W]hen you choose an option on a consent banner or "clear all site data" in your browser, you are generally controlling the use of cookies and other traditional forms of local storage. Fingerprinting, however, relies on signals that you cannot easily wipe. So, even if you "clear all site data" the organization using fingerprinting techniques could immediately identify you again.[101]

Because fingerprinting does not rely on cookies or other traditional storage mechanisms, Subscribers are unable to prevent or block this tracking, even when they actively manage their browser privacy settings. Vimeo's use or enablement of fingerprinting thus allows for the persistent monitoring of Subscribers' identities and online activity across devices and sessions, all without their knowledge or consent.

192.    Therefore, even privacy-conscious Subscribers will find it difficult to escape Google's cross-platform, cross-device tracking.

### E.    Plaintiffs Did Not Consent to Vimeo's Sharing of Their Search Terms

193.    Plaintiffs and Class Members reasonably believed that their communications to the OTT Websites were made in confidence. They were unaware of Vimeo's involvement in the OTT Websites, had no knowledge that Tracking Tools would intercept their Sensitive Information and transmit it to Third Parties, and had no opportunity to prevent this transmittal.

194.    Importantly, Vimeo itself concealed its substantial role in the OTT Websites' operation. Through design, customization tools, and technical guidance, Vimeo obscured its

---

[100] *Our response to Google's policy change on fingerprinting*, INT'L COMMISSIONER'S OFFICE (Dec. 19, 2024), https://ico.org.uk/about-the-ico/media-centre/news-and-blogs/2024/12/our-response-to-google-s-policy-change-on-fingerprinting/ (last visited Feb. 10, 2026).
[101] *Google's Fingerprinting Returns in 8 Weeks And It Will Track Your Devices*, FORBES (Dec. 21, 2024), (last visited Feb. 10, 2026).

involvement so that Subscribers appeared to interact directly with independent OTT Websites rather than with Vimeo's platform. Subscribers reasonably believed their communications to the OTT Websites were private and directed solely to that specific website operator.

195. Despite this concealment, Vimeo integrated Tracking Tools—including its own VHX, the Meta Pixel, and Google's analytics suite—into every OTT Website without obtaining any form of informed, written consent from Subscribers. Plaintiffs and Class Members were never presented with a standalone disclosure regarding the sharing of search terms, nor were they provided any mechanism to grant or deny consent to data collection and sharing. At no point did any OTT Website disclose that Vimeo operated the underlying video delivery system or that tracking tools capable of intercepting communications were embedded in its pages.

196. Vimeo's failure to obtain proper consent is particularly culpable because Vimeo agreed to Meta's and Google's terms of service, which explicitly require implementers to obtain informed consent before deploying these tools. Meta's Commercial Terms and Business Tools Terms require explicit authorization before sharing data, and Meta provides guidance on responsible data handling to ensure that data is shared only with parties from whom requisite rights, permissions, and consents have been obtained. Similarly, Google requires that websites implementing Google Analytics disclose the use of analytics tools and provide Subscribers with the opportunity to grant or deny consent. Despite these contractual obligations, Vimeo deployed these Tracking Tools without any disclosure or consent mechanism for Subscribers.

## TOLLING

197. The statutes of limitations applicable to Plaintiffs' and the Class Members' claims were tolled by Vimeo's wrongful conduct and by Plaintiffs' and the Class Members' delayed discovery of their claims. Vimeo's acts were intentionally concealed, technically complex, and

inherently self-concealing, thereby preventing Plaintiffs and the Class Members from discovering the unlawful disclosure of their Sensitive Information until recently.

198. As alleged herein, Plaintiffs and the Class Members neither knew nor had reason to know of Vimeo's involvement in the OTT Websites' disclosure of their Sensitive Information to Third Parties. Despite exercising reasonable diligence, Plaintiffs and the Class Members could not have discovered Vimeo's unlawful conduct.

199. Vimeo facilitated and enabled the covert incorporation of Tracking Entities' tracking tools into the OTT Websites, including through its own VHX, without providing any notice to Subscribers that their Sensitive Information would be transmitted to Third Parties. These data transfers occurred surreptitiously during routine Subscriber activities—such as searching for content, viewing videos, and purchasing or subscribing to content—without notice, disclosure, labeling, or any meaningful opportunity to consent or opt out.

200. Vimeo further provided tools, configurations, and technical guidance to OTT Website operators that were designed to obscure Vimeo's role in the operation, administration, and data processing functions of the OTT Websites.

201. Vimeo possessed superior and exclusive knowledge that the Tracking Entities' Tracking Tools embedded within its OTT Websites would disclose Subscribers' Sensitive Information. Despite this knowledge, Vimeo failed to inform Plaintiffs and the Class Members that, by interacting with the OTT Websites, their Sensitive Information would be transmitted to Third Parties, including Vimeo itself. At no time were Plaintiffs notified that Vimeo operated or controlled the underlying video delivery infrastructure or embedded tracking mechanisms capable of intercepting and transmitting their communications and video selections.

202. Plaintiffs and the Class Members could not, through the exercise of reasonable diligence, have discovered the full scope of Vimeo's conduct, as its involvement in the development and technical architecture of the OTT Websites, including the integration of Tracking Entities' tools, is highly technical and not reasonably discernible to ordinary Subscribers.

203. Plaintiffs and the Class Members first became aware of Vimeo's misconduct as a result of counsel's investigation and technical analysis conducted in advance of filing this Complaint.

## CLASS ACTION ALLEGATIONS

204. Plaintiffs bring this action individually and on behalf of the following Class against the Defendant:

> All persons in the United States who paid money or otherwise provided information to unlock access to video content on the OTT Websites that had their Sensitive Information disclosed to Tracking Entities through the use of the Tracking Tools on the OTT Websites without providing their prior, written, informed, and distinct consent (the "Nationwide Class").

205. Specifically excluded from the Nationwide Class ("Class") are Vimeo, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Vimeo, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Vimeo and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

206. Plaintiffs reserve the right to amend the Class definition above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

47

207. This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

208. Numerosity (Rule 23(a)(1)): At this time, Plaintiffs do not know the exact number of members of the aforementioned Class. However, given the popularity of Vimeo's OTT Websites, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

209. Typicality of Claims (Rule 23(a)(3)): Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, subscribed to, and used, an OTT Website to watch videos, and had their Sensitive Information collected and disclosed by Vimeo.

210. Adequacy of Representation (Rule 23(a)(4)): Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have no interests antagonistic to, nor are they in conflict with, the Class. Plaintiffs have retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

211. Superiority (Rule 23(b)(3)): A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class Members are relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Vimeo will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

212. Commonality and Predominance (Rule 23(a)(2), 23(b)(3)): There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and

fact common to the Members of the Class that predominate over questions that may affect individual members of the Class include:

    a.    Whether Vimeo collected Plaintiffs' and the Class's Sensitive Information;

    b.    Whether Vimeo unlawfully disclosed and continues to disclose the Sensitive Information of Subscribers of the OTT Websites in violation of the VPPA and state and federal wiretap laws;

    c.    Whether Vimeo's disclosures were committed knowingly; and

    d.    Whether Vimeo disclosed Plaintiffs' and the Class's Sensitive Information without consent.

213. Information concerning Defendant's OTT Websites' data sharing practices and subscription members is available from Vimeo's or third-party records.

214. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

215. The prosecution of separate actions by individual members of the Class would risk inconsistent or varying adjudications and establish incompatible standards of conduct for Vimeo. Prosecution as a class action will eliminate the possibility of repetitive and inefficient litigation.

216. Vimeo has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

217. Given that Vimeo's conduct is ongoing, monetary damages are insufficient, and there is no complete and adequate remedy at law.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT
### 18 U.S.C. § 2710, *et seq.*
### (On Behalf of Plaintiffs and the Nationwide Class)

218. Plaintiffs hereby incorporate by reference and reallege herein the allegations contained in all preceding paragraphs.

219. Plaintiffs bring this count on behalf of themselves and all members of the Class.

220. The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S.C. § 2710(b)(1).

221. "Personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider" (PII) 18 U.S.C. § 2710(a)(3).

222. A "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

223. Vimeo, through the OTT Websites, engages in the business of delivering video content to Subscribers, including Plaintiffs and other members of the Class. The OTT Websites deliver electronically available videos to Plaintiffs and members of the Class on the OTT Websites.

224. Vimeo is a "video tape service provider" because it hosts and delivers hundreds of videos on the OTT Websites it develops, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

225. Plaintiffs and members of the Class are "consumers" because they subscribed to the OTT Websites. 18 U.S.C. § 2710(a)(1).

226. Plaintiffs and members of the Class viewed or obtained video content on the OTT Websites.

227. Vimeo utilized the Tracking Tools, including the VHX and Meta Pixel, which forced Plaintiffs' and Class Members' web browsers to disclose their PII to Third Parties.

228. The VPPA provides that a videotape service provider may disclose personally identifiable information concerning a consumer as long as that consumer has provided "informed written consent . . . in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b)(2)(A)(i).

229. Plaintiffs and Class Members did not provide Vimeo with any form of consent (written or otherwise) to disclose their PII to the Tracking Entities. Nor could Plaintiffs and members of the Class have provided consent because Vimeo's involvement in the development and programming of the OTT Websites was hidden from Plaintiffs and Class.

230. Assuming *arguendo* that Plaintiffs and members of the Class had provided some modicum of consent through a consumer contract of adhesion, Vimeo still failed to obtain "informed, written consent" from Subscribers – including Plaintiffs and members of the Class – "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" and "at the election of the consumer," either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner." 18 U.S.C. § 2710(b)(2)(B)(i)-(ii).

231. Vimeo's disclosure of Plaintiffs' and Class Members' PII was not made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Vimeo's

51

disclosures to Meta were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

232. In addition, the VPPA creates an opt-out requirement for VTSPs in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Vimeo failed to provide an opportunity to opt out as required by the VPPA.

233. On behalf of themselves and the Class, Plaintiffs seek: (i) declaratory relief as to Vimeo; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Vimeo to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

### Injunctive Relief of Vimeo's Ongoing VPPA Violations

234. An actual and immediate controversy has arisen and continues to exist between Plaintiffs and the Class, on the one hand, and Vimeo, on the other. The parties have genuine, direct, and substantial opposing interests. Vimeo has violated, and continues to violate, Plaintiffs' and Class Members' rights to protect their PII under the VPPA.

235. Plaintiffs have demonstrated that they are likely to succeed on the merits of their claims and are thus entitled to declaratory and injunctive relief.

236. Plaintiffs have no adequate remedy at law to stop Vimeo's continuing violations of the VPPA. Unless enjoined by the Court, Vimeo will continue to infringe on the privacy rights of Plaintiffs and the absent Class Members, and will continue to cause, or allow to be caused, irreparable harm to Plaintiffs. Injunctive relief is in the public interest to protect the PII of

Plaintiffs and other members of the Class that would be irreparably harmed through continued disclosure of their PII.

**COUNT II**
**INVASION OF PRIVACY**
**(On Behalf of Plaintiffs and the Nationwide Class)**

237. Plaintiffs hereby incorporate by reference and reallege herein the allegations contained in all preceding paragraphs.

238. Plaintiffs bring this count on behalf of themselves and all members of the Class.

239. Plaintiffs and Class Members have an interest in: (i) precluding the dissemination and/or misuse of their sensitive and confidential information; and (ii) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various Internet sites without being subjected to monitoring from Tracking Entities without Plaintiffs' and Class Members' knowledge or consent.

240. Within the relevant time period, by implementing the Tracking Tools on the OTT Websites, Vimeo intentionally invaded Plaintiffs' and Class Members' privacy rights, and procured the Tracking Entities to do so.

241. Plaintiffs and Class Members had a reasonable expectation that their Sensitive Information would remain confidential and that Vimeo would not facilitate the installation of Tracking Tools on the OTT Websites.

242. Plaintiffs and Class Members did not consent to any of Vimeo's actions in implementing the Tracking Tools on the OTT Websites.

243. This invasion of privacy is serious in nature, scope, and impact.

244. This invasion of privacy constitutes an egregious breach of the social norms underlying the privacy right.

245. Vimeo's conduct was intentional. As a sophisticated technology company, Vimeo understood the functionality of the Tracking Tools and knew that their deployment would result in the interception and disclosure of Subscribers' Sensitive Information. Vimeo was aware that any Sensitive Information collected through the Tracking Tools would be aggregated into larger marketing profiles built from information collected by the Tracking Tools across the Internet and used to improve advertising effectiveness targeting Plaintiffs and Class Members.

246. As a result of these violations, Plaintiffs and Class Members seek all relief available for invasion of privacy claims.

**COUNT III**
**VIOLATION OF THE FEDERAL WIRETAP ACT**
**18 U.S.C. § 2510, *et seq*.**
**(On Behalf of Plaintiffs and the Nationwide Class)**

247. Plaintiffs hereby incorporate by reference and reallege herein the allegations contained in all preceding paragraphs.

248. Plaintiffs bring this count on behalf of themselves and all members of the Class.

249. The Federal Wiretap Act, 18 U.S.C. §§ 2510 et seq., prohibits any person from intentionally intercepting, using, or procuring another to intercept any wire, oral, or electronic communication without the consent of at least one party to the communication.

250. The Act provides a private right of action to any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of the statute. 18 U.S.C. § 2520(a).

251. Vimeo is a "person" within the meaning of the Act because it is a corporation. 18 U.S.C. § 2510(6). Plaintiffs and Class Members are likewise "persons" as individuals under the statute.

252. The Act defines "intercept" as the acquisition of the contents of any wire or electronic communication through the use of any electronic or mechanical device. 18 U.S.C. § 2510(4). An interception occurs during transmission, including before the communication reaches its final destination.

253. "Contents" include information concerning the substance, purport, or meaning of a communication. 18 U.S.C. § 2510(8). The contents at issue include Subscribers' video viewing selections, search queries, navigation activity, and related identifying information.

254. Plaintiffs' and Class Members' interactions with the OTT Websites—including searches, video selections, and media player interactions—constitute "electronic communications" under 18 U.S.C. § 2510(12).

255. Vimeo used its servers and embedded Tracking Tools, including VHX and the Meta Pixel, to acquire the contents of these communications during transmission. The Tracking Tools were deployed on Subscribers' browsers and activated when Subscribers engaged in monitored activity, causing Subscribers' browsers to duplicate and transmit the communication data to Vimeo and other Tracking Entities.

256. These interceptions occurred contemporaneously with transmission and before the communications were fully received and processed by the OTT Websites.

257. Vimeo also procured and enabled other Tracking Entities to intercept these communications by generating, hosting, and integrating Tracking Tool code into its turn-key OTT Websites.

258. The Tracking Tools operated invisibly within Subscribers' browsers and were designed to monitor and transmit Subscriber activity without detection or disclosure.

259. Plaintiffs and Class Members had a reasonable expectation that their interactions

with the OTT Websites—including their PII and search queries—would not be intercepted or disclosed to Third Parties.

260. Plaintiffs and Class Members were not informed that Vimeo operated the video delivery infrastructure or embedded Tracking Tools capable of intercepting and transmitting their communications, nor did they provide consent to such interception or disclosure.

261. During the relevant period, Vimeo intentionally intercepted, disclosed, and used Plaintiffs' and Class Members' electronic communications for the purpose of monetizing their Sensitive Information.

262. Each time a Subscriber searched for content, navigated the OTT Websites, or interacted with video playback controls, the Tracking Tools intercepted and transmitted the contents of those communications.

263. Vimeo's conduct was knowing and willful. As a sophisticated technology company, Vimeo understood the functionality of VHX and other Tracking Tools and knew that their deployment would result in the interception and disclosure of Subscribers' communications. No consent was ever requested or obtained.

264. As a result of these violations, Plaintiffs and Class Members are entitled to relief under 18 U.S.C. § 2520, including: (a) actual damages and any profits made as a result of the violations, or statutory damages of the greater of $100 per day per violation or $10,000; (b) appropriate equitable or declaratory relief; and (c) reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Vimeo, as follows:

a. For an order determining that this action is properly brought as a class action and

certifying Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

b. For an order declaring that the Vimeo's conduct violates the statutes referenced herein;

c. For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

d. Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Vimeo to immediately (i) remove the Tracking Tools from the OTT Websites or (ii) add, and obtain, the appropriate consent from Subscribers and other general users and visitors to the OTT Websites;

e. For damages in amounts to be determined by the Court and/or jury;

f. An award of statutory damages or penalties to the extent available;

g. For pre-judgment interest on all amounts awarded;

h. For an order of restitution and all other forms of monetary relief;

i. An award of all reasonable attorneys' fees and costs; and

j. Such other and further relief as the Court deems necessary and appropriate.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs demand a trial by jury of all issues so triable.

Dated: February 20, 2026          **BAILEY & GLASSER LLP**

By: */s/ Patrick O. Muench*
Patrick O. Muench
318 W. Adams Street, Suite 1512
Chicago, IL 60606
Telephone: (312) 500-8680
Facsimile: (304) 342-1110
Email: pmuench@baileyglasser.com

Mark S. Reich*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com

John Roddy*
**BAILEY & GLASSER LLP**
101 Arch Street, 8th Floor
Boston, MA 02110
Telephone: (617) 439-6730
Facsimile: (617) 951-3954
Email: jroddy@baileyglasser.com

Michael L. Murphy*
**BAILEY & GLASSER LLP**
1055 Thomas Jefferson St. Suite 540
Washington, DC 20007
Telephone: (202) 463-2101
Facsimile: (202) 463-2103
Email: mmurphy@baileyglasser.com

* *pro hac vice* forthcoming

*Counsel for Plaintiffs*